IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 12, 2020 Session

**STATE OF TENNESSEE v. JOSHUA W. CHAMBERS**

**Appeal from the Circuit Court for Montgomery County**
**No. CC17-CR-12   William R. Goodman, III, Judge**

_____

**No. M2019-00694-CCA-R3-CD**

_____

On January 5, 2017, the Montgomery County Grand Jury indicted Defendant, Joshua W. Chambers, for first degree premeditated murder of the victim, Richard Gibeau, and employment of a firearm during the commission of a dangerous felony. Defendant claimed he killed the victim in self-defense. On May 24, 2018, a jury convicted Defendant of second degree murder. The jury did not reach a verdict on the firearm charge. On November 21, 2017, after the victim was killed but before Defendant's trial, the Tennessee Supreme Court issued *State v. Perrier*, holding "that the legislature intended the phrase 'not engaged in unlawful activity' in the self-defense statute [Tennessee Code Annotated section 39-11-611] to be a condition of the statutory privilege not to retreat when confronted with unlawful force and that the trial court should make the threshold determination of whether the defendant was engaged in unlawful activity when he used force in an alleged self-defense situation." 536 S.W.3d 388, 392 (Tenn. 2017). The trial court instructed the jury using Tennessee Pattern Instruction 40.06(b) as it existed before it was amended to comply with *Perrier*. The instruction given to the jury erroneously required the jury, rather than the trial court, to determine if Defendant was engaged in unlawful activity. On appeal, Defendant argues that the trial court erred by giving an improper jury instruction on self-defense. The State concedes error in the self-defense instruction but claims the error was harmless. Defendant also claims the trial court erred by granting the State's motion to amend the indictment on the day of trial, by permitting the admission of prejudicial evidence, by denying Defendant's Motion for Judgment of Acquittal and Motion for a New Trial, and by submitting an incorrect verdict form to the jury. After a thorough review of the record and applicable case law, we find that the trial court committed reversible error by improperly instructing the jury on self-defense. Thus, we reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. Proc. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Dana C. McLendon, III, Franklin, Tennessee (on appeal) and Justin C. Sensing, Clarksville, Tennessee (at trial), for the appellant, Joshua W. Chambers.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Dan Brollier, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural History

On January 5, 2017, the Montgomery County Grand Jury indicted Defendant, Joshua W. Chambers, for first degree premeditated murder of the victim, Richard Gibeau, in count one and employment of a firearm during the commission of a dangerous felony (unspecified) in count two. On March 8, 2018, the State moved to amend the indictment for count two to include "voluntary manslaughter" as the specified "dangerous felony," and on May 21, 2018, the first day of trial, the trial court granted the motion to amend the indictment. Following a jury trial, Defendant was convicted of second degree murder. The jury was unable to reach a verdict in count two. The trial court sentenced Defendant to serve eighteen years in the Tennessee Department of Correction at one hundred percent release eligibility.

### I. Pretrial Motions

On March 7, 2018, Defendant filed a motion to dismiss count two of the indictment, employing a firearm during the commission of a dangerous felony, because the State failed to specify the "dangerous felony" upon which the State intended to rely at trial. On March 8, 2018, the State filed a motion to amend count two of the indictment to specify the "dangerous felony" upon which it would rely was "voluntary manslaughter." The State argued that "this change [did] not present a different offense and that no substantial rights of [D]efendant [would] be unfairly prejudiced by the amendment."

On May 21, 2018, the first day of trial, the trial court denied Defendant's motion to dismiss count two and granted the State's motion to amend count two of the indictment.

## II. Trial

### A. State's Proof

Shane Givens testified that he worked as an assistant director for Montgomery County 911. Mr. Givens authenticated Defendant's 911 call from October 5, 2016, and an audio recording and a transcript of the call were admitted into evidence. In part, the transcript read:

[DEFENDANT]: I just shot someone.

[DISPATCHER]: Where are you, ma'am? (sic)

[DEFENDANT]: It's [on] Watertown Place. I am surrendering myself peacefully. I'm gonna put the gun down. It was a heated altercation. I shot someone. I apologize.

[DISPATCHER]: [O]kay, ma'am. (sic) Uh, the person that you shot, are they . . .

[DEFENDANT]: They're dying. I - I - he's dying. He's dying. I apol- I - I need the police and an EMT.

[DISPATCHER]: Um, who did you shoot?

[DEFENDANT]: I shot [the victim], he's the homeowner.

[DISPATCHER]: Okay. Does he live there?

. . . .

[DEFENDANT]: Yes. And he ca- I was staying with him and he choked me. And then, he came at me again and I shot him. Um . . .

[DISPATCHER]: Okay.

[DEFENDANT]: . . . I shouldn't have shot him.

[DISPATCHER]: Is he conscious . . .

[DEFENDANT]: I shot him four . . .

[DISPATCHER]: . . . and breathing?

[DEFENDANT]: He's breathing. I don't think he's conscious.

[DISPATCHER]: Where did you shoot him at?

[DEFENDANT]: I shot him in the chest. In the neck.

[DISPATCHER]: N- how many times did you shoot him?

[DEFENDANT]: Uh, I shot him four times. I think, three or four times.

Darren Koski testified that he was employed with the Clarksville Police Department's Crime Scene Team and that he responded to the scene on Watertown Place. As Officer Koski approached Defendant, Defendant said, "I messed up, I'm so sorry. . . . I messed up bad. The murder weapon, if it is murder at this point, is right there by the [Honda] Ridgeline." Officer Koski took several photographs of the scene. The photograph of the living room showed that "the mini blinds . . . ha[d] been kind of ruffled up or disheveled[.]" Officer Koski testified that the distance from the backyard gate to the victim's foot was almost seven feet. The measurement from the door of the garage to the victim's foot was almost twenty-five feet.

On cross-examination, Officer Koski testified that, when he arrived at the Watertown Place scene, he did not draw his weapon as he approached Defendant. Defendant was cooperative and "quite talkative" and asked Officer Koski when he could tell his side of the story. Officer Koski gave custody of Defendant to Officer Gannon Gray. He stated that, based on the photographs from the scene, it appeared that the Honda Ridgeline was "blocking in" a Ford Explorer and that it did not appear that the Explorer could get around the Ridgeline. Officer Koski stated that he arrived at the scene at 5:32 p.m. and began taking photographs at 6:21 p.m. By the time Officer Koski began taking photographs, nineteen people had been at the scene. He recalled that, at one point, he yelled out to another officer to stop and back up because the other officer was about to walk through the unmarked shell casings on the ground.

Dr. Miguel Laboy testified that he was a medical examiner with the Nashville Medical Examiner's Office. He stated that he did not perform the autopsy on the victim but that he reviewed the autopsy report and the deposition testimony of Dr. Feng Li, who performed the autopsy. Dr. Laboy agreed with Dr. Li's conclusion that the victim died from a gunshot wound to the neck.

On cross-examination, Dr. Laboy agreed that the trajectory of the bullet was "slightly downward." He concluded that, depending on the height of the individuals involved, the trajectory could be consistent with the victim leaning forward. Dr. Laboy also testified that the abrasions on Defendant's neck after the incident were more consistent with blunt force trauma than with "general redness" from "rubbing" and "scratching."

Rebecca Gibeau testified that she was married to the victim for thirty-nine years. She said that the victim had been a corrections officer in Connecticut for twenty years and was in the Navy prior to that. Mrs. Gibeau stated that, while the victim was working in corrections in Connecticut, "he had his back broken in a prison riot[.]" Once they moved to Tennessee from Connecticut, the victim had several surgeries and "was not in the best of health." She testified that the victim was six feet, eight inches tall and weighed approximately 210 pounds at the time of his death.

Mrs. Gibeau testified that she knew Defendant for ten years and that, prior to the shooting, she knew only that Defendant and her son Jacob Gibeau were "just the best of friends." She said that Defendant lived in her home for eight years and that they never really had any problems with him. Mrs. Gibeau stated that Defendant never bullied or threatened her, her children or grandchildren.

Mrs. Gibeau said that, on the day her husband was killed, Defendant "had words" with her because she borrowed Defendant's Ford Explorer without asking. Defendant, the victim, Mr. Jacob Gibeau,[1] and Mrs. Gibeau all became "involved in the discussion," and "it got really loud." The victim told Defendant that he was being disrespectful and that he needed to "pack his bags and leave." Mrs. Gibeau testified that Defendant then "advanced on" the victim, and they were "bumping chests like two guys would do." She said that the victim "backed [Defendant] up to the window" and broke the blinds. She said, "I mean, it was forceful, but I mean he didn't choke [Defendant] or anything like that." She testified that she and Mr. Jacob Gibeau "got in the middle of both of them" because they were not "sure of what was going to happen next." She stated that she had no problem pulling the victim off Defendant. At that point, Defendant went upstairs to pack, and the victim went outside to smoke a cigarette. She said the victim was in the backyard "just walking around trying to walk it off." Defendant came back downstairs and exited through the kitchen door. She stated, "I saw [Defendant] go out the kitchen door. I did not see him until I heard loud voices and I looked out my kitchen window." She testified that both the victim and Defendant were standing still. Mrs. Gibeau heard the victim yell for her to "call the cops" because Defendant had a gun. Defendant drew

---

[1] Because Mr. Jacob Gibeau has the same last name as the victim, we will use his first name for clarity. No disrespect is intended.

his gun and said, "go ahead, say something," and then Mrs. Gibeau heard a rapid succession of firing. She said that the backyard gate was closed because they had a dog that had a tendency to run, so "we [were] very good with keeping the gate closed." Mrs. Gibeau stated that the victim and Defendant were approximately ten feet apart at the time of the shooting.

On cross-examination, Mrs. Gibeau stated that she gave a statement to police.[2] She agreed that it was possible she told police that she never saw Defendant go out the kitchen door or go through the kitchen. She did not recall telling Detective McClintock that, when the victim saw the gun, he walked towards the gate. She agreed that, when she gave a statement to Detective McClintock, she said that the victim did not say or yell anything about a gun, and that Defendant and the victim were "about a car length" apart at the time of the shooting. Mrs. Gibeau agreed that, in her written statement on the day of the shooting, she said that Defendant pulled his gun after the victim asked Defendant a question and that Defendant was carrying several items at the time he pulled the gun. She agreed that her statement to police on the day of the shooting was likely more accurate than her memory at trial.

Mrs. Gibeau stated that she was not surprised when the victim backed Defendant into the blinds because the victim treated Defendant like "any of [his] sons" when they were disrespectful. She said, "[T]he furthest I have ever seen [the victim] go . . . [was] he bumped chests. He never raised his hand. He never initiat[ed] anything." She agreed that, although the victim had health problems, he swam for exercise, and he was strong enough to back Defendant into the blinds.

On redirect examination, Mrs. Gibeau testified that Defendant knew about the victim's health problems and his prior open heart surgery and pacemaker. She agreed that she did not remember much from the night of the shooting and that, "if [she] said it and [she] signed the statement" to the officer, "then that's what happened."

Mr. Jacob Gibeau testified that he was the son of the victim and had known Defendant for about ten years. At the time of the shooting, Mr. Jacob Gibeau, Defendant, and Thomas Fox were renting the home on Watertown Place owned by the victim and Mrs. Gibeau. Mr. Jacob Gibeau stated that he was in a romantic relationship with Defendant but that his parents did not know because "[t]hey wouldn't approve of a relationship like that."

Mr. Jacob Gibeau testified that, on the day of the shooting, the victim and Mrs. Gibeau used the Ford Explorer, which he and Defendant made payments on together.

---

[2] This statement was not admitted at trial.

Defendant did not want the victim and Mrs. Gibeau to drive the Explorer because it was registered to Defendant's father. The victim and Mrs. Gibeau did not know that Mr. Jacob Gibeau and Defendant paid for the vehicle together because they did not want to "raise questions" about their relationship. They led Mrs. Gibeau and the victim to believe that the Explorer belonged to Mr. Jacob Gibeau. Defendant "got upset" because the victim and Mrs. Gibeau had borrowed the vehicle, and he started yelling at Mrs. Gibeau not to drive his vehicle. Mrs. Gibeau responded that it was not Defendant's vehicle but belonged to Mr. Jacob Gibeau. Mr. Jacob Gibeau testified that Defendant "started getting loud and disrespectful" to Mrs. Gibeau, which made Mr. Jacob Gibeau angry. Mr. Jacob Gibeau took Defendant upstairs to continue the discussion in private, and Mr. Jacob Gibeau asked Defendant to leave and "take a break" until his parents returned to Massachusetts.

Then Defendant returned downstairs with some of his belongings and put them outside in his vehicle. Mr. Jacob Gibeau's sister and his nieces left the residence at that time. Mr. Jacob Gibeau went to the kitchen to prepare his lunch for work when the verbal altercation between the victim and Defendant began in the living room. He stated that the victim thought that Defendant was trying to "rip off" Mr. Jacob Gibeau by taking the Explorer. Mr. Jacob Gibeau saw the victim from behind as he was arguing with Defendant. He stated that the victim "argue[d] a lot like Bill O'Reilly, he'[d] talk over you, talk through you, and [Defendant] got frustrated" and told the victim "f*ck you." Mr. Jacob Gibeau said, "And then [the victim] got upset and all I saw was [the victim] take off across the room and I went out" to the living room. He said, "From what I can remember, it appeared that [the victim] backhanded [Defendant] and choked him." Defendant "was up against the window area of the room[,]" and Mr. Jacob Gibeau and Mrs. Gibeau were able to break up the altercation within "a couple of seconds, maybe." Mr. Jacob Gibeau could not recall if the victim made any threats against Defendant but said that there was "a possibility." Mr. Jacob Gibeau agreed that, when he made a statement to police on the night of the shooting, he reported that the victim told Defendant, "I'll kill you."

At this point, Mrs. Gibeau sent the victim outside to have a cigarette, and Mr. Jacob Gibeau took Defendant back upstairs "to calm down a little bit and talk" for about five minutes. Defendant asked Mr. Jacob Gibeau to move out with him. Mr. Jacob Gibeau told Defendant that he was about to go to work, so they would discuss it later. Defendant "seemed kind of sad. . . . He didn't seem angry[.]"

Mr. Jacob Gibeau went to the upstairs bathroom and heard voices outside. He said, "I knew that they were talking and it was not very friendly tones and I figured the argument was picking back up." He went downstairs to text his boss that he was not coming to work, and Mrs. Gibeau said, "He's got a gun." Mr. Jacob Gibeau heard shots

ring out, he ran out the back door, and he saw the victim lying in the flower garden off the patio without any weapons. Mr. Jacob Gibeau testified that he moved the victim off the "monkey grass" and straightened his legs, so that his body was about a foot further from the gate than where he fell. He said that Defendant was standing still by the weight bench outside the backyard gate.

Mr. Jacob Gibeau testified that Defendant would work out at the gym and would try to run on the treadmill at times, though Defendant struggled in the colder months due to his lung surgery. He said that he and Defendant would go shooting together and that Defendant owned the gun that he used the day of the shooting.

Mr. Jacob Gibeau testified that, prior to the events of October 5, 2016, the victim and Defendant had a good relationship and that Defendant was very close to the whole family. Mr. Jacob Gibeau never recalled any prior threatening behavior from the victim though the victim and Defendant would argue about politics and religion. Mr. Jacob Gibeau testified that, three or four years prior, the victim gave Mr. Jacob Gibeau a backhand during an argument. However, he was not afraid of the victim and did not believe Defendant was afraid of the victim.

On cross-examination, Mr. Jacob Gibeau agreed that the victim had "issues with anger" and was seeking treatment. He said that Defendant knew that the victim had anger issues and had been a prison guard. Mr. Jacob Gibeau stated that Defendant was present during several physical altercations between the victim and himself and his brother, Nick Gibeau. He agreed that, after Defendant cursed at the victim on the night of the shooting, the victim "ran across the room[,]" "backhanded [Defendant,]" "backed him into a window," and "put his hands on [Defendant's] neck" until Defendant's "face was red." Mr. Jacob Gibeau testified that, after he and Defendant calmed down upstairs, Defendant grabbed some things to finish packing, including his gun. Defendant's gun was valuable; he had paid about $500 for it. After Defendant returned downstairs, Mr. Jacob Gibeau heard the victim yelling in "aggressive" or "hostile" tones. Mr. Jacob Gibeau testified that, when he heard gunshots, his initial thought was "where the hell did [the victim] get a gun from?" For the prior two weeks, the victim had been "more irritable" and "more angry than he had been before," so Mr. Jacob Gibeau assumed it was the victim who had fired a gun. Just before the shots were fired, Mr. Jacob Gibeau heard the victim say to Defendant, "You're going to pull a mother f*cking gun at me in my own mother f*cking house[?]" When Mr. Jacob Gibeau exited the house after the shots were fired, he saw that Defendant looked scared and that Defendant was trying to keep his distance from everyone. Mr. Jacob Gibeau testified that Defendant immediately called 911 and appeared to be afraid. He said that the time between when the victim choked Defendant and the shots were fired was approximately five minutes. He stated that Defendant was five feet, eight inches tall and that the victim was six feet, nine inches tall.

Mr. Jacob Gibeau testified that there was a gate between the victim and Defendant at the time of the shooting but that he could not remember if the gate was opened or closed. He remembered going through the gate several times that evening after the shooting and did not remember having to open it. Mr. Jacob Gibeau testified that sometimes his nieces would leave the gate open.

Mr. Jacob Gibeau stated that, after the shooting, he found what appeared to be three bullet holes in the backyard in the ground by the gazebo and the shrubbery.

On redirect examination, Mr. Jacob Gibeau testified that, for Defendant to walk towards the Explorer from the garage door, he would have exited the door and turned right. However, when Mr. Jacob Gibeau came out of the house after the shots were fired, Defendant was standing between the garage door and the gate, the opposite direction from the Explorer.

On recross-examination, Mr. Jacob Gibeau agreed that, at the preliminary hearing shortly after the shooting, he testified that Defendant was closer to the lawnmower and thus would have moved laterally from the garage door. Mr. Jacob Gibeau agreed that his memory at the preliminary hearing was likely more accurate than his memory at trial.

Laura Hodge testified that she was a Special Agent Forensic Scientist for the Tennessee Bureau of Investigation in the Firearms and Tool Mark Identification Unit. She stated that an "ejection pattern" for a firearm was an analysis of where the cartridge cases land when shot. However, "because there are so many variables," Agent Hodge could not conclusively determine the location of the shooter when the pistol was fired.

On redirect examination, Agent Hodge testified that, if the gun did not have a cartridge in the chamber, a shooter would have to "reach up and grab the slide and cycle it to the rear in order for a cartridge to be stripped off the top of the magazine and placed into the chamber." Agent Hodge then demonstrated to the jury the act of chambering a cartridge and stated that the gun also had "a couple of safeties" as well. On recross-examination, she stated that chambering a cartridge would take "[j]ust a matter of a second." She stated that the pistol had the capacity to hold "a total of eleven cartridges[:] ten in the magazine and one in the chamber."

Gannon Gray testified that he worked in the Patrol Division of the Clarksville Police Department. He stated that, when he arrived at the scene on Watertown Place, there were already several officers there. Officer Gray saw Defendant in custody in the front yard and took Defendant under his care, placing Defendant in his patrol car. Officer Gray said that he never asked Defendant any questions and that everything Defendant

said to him, Defendant "offered up." Defendant told Officer Gray that he was being cooperative and that he accepted responsibility for what had happened. He agreed that Defendant was courteous and polite and inquired as to how the victim was doing. Officer Gray did not recall Defendant having any injuries.

Richard Duke testified that he worked as a sergeant with the Clarksville Police Department. Sergeant Duke stated that, when Defendant arrived at Special Operations on the day of the shooting, Defendant made statements to Sergeant Duke. Sergeant Duke said, "He wanted me to know that he had been fully cooperative and he wanted me to know that he was . . . fully culpable of what had happened. I thought it was odd." Sergeant Duke testified that Defendant's demeanor was "very calm." Sergeant Duke did not remember if Defendant had any injuries. On cross-examination, Sergeant Duke said that he was not looking for injuries when he spoke with Defendant.

Eric Ewing testified that he worked as a sergeant with the Clarksville Police Department in the homicide division. Detective Ewing said that he began interviewing Defendant about 6:45 p.m. on the night of the shooting and that he had not been to the scene of the shooting prior to the interview. Defendant signed a *Miranda* waiver and told Detective Ewing that he wanted to talk about the shooting. During the interview,[3] the following exchange occurred:

> [DET. EWING]: And from the other side of the fence [the victim is] getting aggressive with you verbally?
>
> [DEFENDANT]: . . . I can't hear what he's saying. Like, I'm not understanding what he's saying because I was so upset. But he's turning and he's raising his voice and he's saying something. So . . .
>
> [DET. EWING]: Okay. And this [is] important - and I'm just trying to throw everything out there, the truth, obviously not, you know, spinning it in any certain way. So you don't understand what he's saying . . . but he's saying it aggressively - angrily.
>
> [DEFENDANT]: Yes. And I'm not - okay, I don't want to claim any de- self-defense or anything because I shouldn't have done this. I should have just put everything in the car and . . .
>
> [DET. EWING]: Well I just want you to tell the truth.

---

[3] The State played the entirety of Defendant's interview with Detective Ewing for the jury.

[DEFENDANT]: I am - I am. . . . And I'm just[,] now there's maybe [four] feet in between - [four] to [eight] feet between us so I'm not 100% certain on distance. I'm not that good at measuring distance that well[.]

[DET. EWING]: So him being on the other side of the fence, talking at you aggressively. Uh, but you can't discern specifically what he's saying. So by that same respect, he didn't threaten you at that time that you're able to decipher?

[DEFENDANT]: Exactly. . . . [T]he mannerisms felt threatening. . . . But I can tell you that he sat there and when he was choking me, I heard this very clearly, he said three times, "I'll kill you." And I said, "Don't you choke me again." And he says, "What are you going to do? Stop me? I'll kill you."

After discussing with Detective Ewing the items Defendant took out of the house to put in his vehicle, the following exchange occurred:

[DEFENDANT]: [L]ike I said he starts turning and he's saying something and I can't discern what it is. And I turned to him and I say, "Don't say another godd*mn thing to me." And . . .

[DET. EWING]: So you kind of warned him.

[DEFENDANT]: That I don't want to have to deal with this.

[DET. EWING]: A confrontation.

[DEFENDANT]: Yeah. Um, I didn't want to have a confrontation with him to begin with. . . . I said, "Just don't say another godd*mn thing. I'm leaving." You know? And then he starts like I said coming to me. And the way he's coming to me I'm feeling threatened. You know? So. . .

[DET. EWING]: So what happened then? You set your stuff down?

[DEFENDANT]: No, I . . . had one hand free . . . and I pulled it out - I pulled the gun out, pointed it at him. And . . . he says, "He's pointing - you're pointing a gun on me, really?" And he started walking. And that's when I popped it. Um, I think I dropped what I had at that point. I'm not - like I said I'm not 100% certain on what I had in my hand but I know I cocked it. Um, and then he's, like, "Call the cops, he's threatening me."

- 11 -

And then he, you know, it seemed - he takes another step to me, it seems like that he was just [righting] himself, I'm not sure. 'Cause like I said . . . I'm still feeling, you know, threatening (sic) and not 100% focused on everything and that's when I pull the trigger. And then he said something, I can't hear it again and then I pull the trigger another two times. And then she comes out and she starts screaming, "You shot [the victim]. Jacob, call 911. He shot [the victim] - he shot dad." And then that's when I pulled out my phone and I'm like, "I'm calling the cops - I'm calling 911 - I'm calling 911."

[DET. EWING]: So it seems like pulling the gun and displaying a gun was an effective use of force. . . . Like when you showed him the gun it seemed like that altered his behavior. He's like, oh sh*t he's got a gun . . . you know? And he said, "You're pulling a gun on me? So he seen the gun, he acknowledged it which he stated to you. And then he told his wife to call the cops because you pulled a gun on him.

[DEFENDANT]: Yes.

[DET. EWING]: So it seemed like that kind of would have maybe solved the situation.

[DEFENDANT]: It - like I said it may have and I - he may have just been shifting and [righting] himself and trying to, like, keep things from escalating further. And I took it dif- I took it as he was making a threatening move because of everything that had already gone on. Um, so that - I mean that may have been - it's hard - I. . .

[DET. EWING]: And I'm just trying to be objective. . .

[DEFENDANT]: Yes, no - no, I understand. And I'm - I've been thinking about this too. May- he - he may not have been meaning to threatening me. You know? He may not have been - he may have been trying to not - he may have been. . .

[DET. EWING]: But you felt the way you felt. . .

[DEFENDANT]: Yeah.

[DET. EWING]: If that's what you honestly felt.

[DEFENDANT]: Yeah.  But that's what I'm saying, his intent may have been. . .

[DET. EWING]: His intent could have been different. . . .  But I think I understand through this process you felt angry though.

[DEFENDANT]: I felt angry because of the choking

. . . .

[DET. EWING]: I think you need to take a good internal introspective look to see if - and I'm not saying this is the case, I'm just saying this is a possibility. . . for you to be honest about this.  Did you shoot him more out of anger and being upset because of what he did to you and put his hands on you . . . and the aggression and the disrespect rather than fear?  Because that's kind of the way you're describing it.

[DEFENDANT]: I . . . I'm going to be honest.  I've thought about this as I - on the ride over here and as I've been sitting in here.  I don't know exactly.  Um, I know I was afraid.  Um, the choking thing I think may have - I know the choking things (sic) was a major factor for me to be afraid.

[DET. EWING]: Absolutely.

[DEFENDANT]: The disrespect - the bullying.  The disrespect to Jacob, who I'm in love with.  You know I am.  Um. . .

[DET. EWING]: So I mean he's walking all over Jacob, he's walking all over you.  He's putting his hands on you.

[DEFENDANT]: He's disrespecting his wife, he's disrespecting his youngest granddaughter Abigail because of the fact that she's half black.  He's disrespecting his daughter, he's disrespecting (Tom) - he's disrespecting everybody.  And it's all, . . . but I'm not sure how much of all this factors into everything.  You know?  . . . .  [T]here is no way that I'm expecting any leniency.  I'm not - I'm not claiming any form of innocence.  I'm claiming guilt.  I did this.

[DET. EWING]: Well I'm just - I'm just trying to . . . to work with you about the real true cause, the reason that's behind . . . the situation.  And

- 13 -

I'm not trying to say guilt or innocence. . . at this point. I'm just trying to say let's lay the truth out on the table.

[DEFENDANT]: Yes. And I'm laying - I'm telling you I'm not sure how much of everything factored into everything. Um, I know that there was legit fear and I'm not sure. . .

[DET. EWING]: But fear of him as a person. . .

[DEFENDANT]: And fear of him coming at me because of his mannerisms and the choking and, uh, I'll kill you five minutes or maybe before.

. . . .

[DET. EWING]: When [the victim] saw the gun, he didn't charge at you or anything like that?

[DEFENDANT]: He - there was - like I said there was a step or two, but that could have been him shifting and [righting] himself that I misinterpreted or a step.

[DET. EWING]: Regardless of a step or two, it wasn't four towards you past the fence. . .

[DEFENDANT]: No.

[DET. EWING]: . . . the fence threshold?

[DEFENDANT]: No.

[DET. EWING]: So he didn't come at you after you pulled the gun?

[DEFENDANT]: No.

[DET. EWING]: And he didn't assault you, he didn't threaten you that you were able to hear - you didn't hear any threats. Um, you pulled the gun and he reacted to the gun saying call the police. . .

[DEFENDANT]: Yes.

[DET. EWING]: . . . and you pulled a gun on me. And then you had time to cock it and then fire a couple times and then fire again.

[DEFENDANT]: Yes. . . . [T]he whole thing is overboard. I acknowledge. It should - I shouldn't have done that, it shouldn't have happened. Um, it's not - it's incredibly wrong. I messed up, um, that's understating it.

. . . .

[DET. EWING]: You know if you pulled the gun because you felt threatened by [the victim] and then whether that was just - if that ended it. But then cocking it and shooting. . .

[DEFENDANT]: I know.

[DET. EWING]: . . . was - kind of seems a little excessive, [Defendant].

[DEFENDANT]: It does - it does. And it does in hindsight. And I'm not - at the time I don't think it did to me, I don't feel like it did to me. At the time it felt...

[DET. EWING]: And that's the thing. . .

[DEFENDANT]: Yeah.

[DET. EWING]: . . . you know at the time how you were feeling is - is definitely a factor.

[DEFENDANT]: But I - it was - it's all a f*cked up situation. . . . I robbed so many people - so many people with this. And I feel absolutely terrible for everyone. . . . I would rather not go to court. I would rather just straight up go to prison or jail, wherever you guys send me. Um, because I don't feel like it's needed if I'm admitting guilt. You know? . . . I at least hurt so many people around [the victim], so may innocent people I've hurt with that. I don't feel it's - I don't feel I need to go on trial. I feel I just need to go and take my punishment. You know?

. . . .

[DET. EWING]: With the shooting of [the victim] and stuff, what do you think your actual intent was at the time?

- 15 -

[DEFENDANT]: At the time I think more than anything I just wanted him to stop everything. Stop his - his - the way he had been - he was speaking to me at the time, stop the way he treated his wife, stop the way he treated his kids, stop the way he treated his granddaughter Abigail. Stop everything and stop attacking me physically or making me feel like I'm going to be attacked. You know I just - and, like, after I pulled [the] trigger it didn't feel real. You know?

After Defendant wrote out his statement and had his neck photographed by officers, he said:

[DEFENDANT]: I just want to go and start doing my time as quickly as possible because . . . the less time it takes for all of this th[en] the less time more people have to put in work on that, you know, . . . which is more things that I have on me. . . . I messed up and I just want to do everything I can to try and pay it back and fix it. And I don't know I'll ever be able to truly do that, so I just want to try.

Detective Ewing said that he did not notice any redness or injuries on Defendant at the beginning of the interview. However, during the interview, he noticed Defendant rubbing his neck.

On cross-examination, Detective Ewing agreed that, at the beginning of his interview with Defendant, he was unaware that Defendant had been choked and did not know to look for any sort of abrasions. Detective Ewing agreed that Defendant was cooperative and forthcoming and that he had remorse. He testified that he believed Defendant had a right to be at the Watertown Place property. Detective Ewing agreed that, when he suggested to Defendant that he shot the victim "out of anger," Defendant responded by saying, "I know I was afraid" and that the choking was a major factor in his fear. Detective Ewing agreed that Defendant made several statements throughout the interview about his fear and that, upon Detective Ewing's third suggestion that Defendant shot the victim out of anger, Defendant agreed it was a possibility. Detective Ewing agreed that Defendant called 911 as soon as he shot the victim and that no one else in the home called 911.

On redirect examination, Detective Ewing testified that he had never heard a defendant use the term "culpability" before and that he believed Defendant was a fairly intelligent person. Detective Ewing said that he did not see anything on Defendant's neck consistent with Detective Ewing's prior experience with choking and strangulation cases and that he did not see any redness on Defendant's neck until Defendant started

- 16 -

rubbing and scratching it. Detective Ewing stated that Defendant mentioned his statement, "don't say a godd\*mn thing to me," before Detective Ewing suggested to Defendant that he shot the victim out of anger. Detective Ewing also pointed out that, through the course of the interview, Defendant first said the victim was "barreling" towards him and later said the victim was "changing his weight, maybe a step or two." In Defendant's written statement, he said that the victim made a "movement or shift" before Defendant fired his gun.

On recross-examination, Detective Ewing agreed that, if someone was more than a foot taller than him and attempted to choke him, he would feel threatened "at the time."

## B. Motion for Judgment of Acquittal

At the close of the State's proof, defense counsel filed a motion for a judgment of acquittal arguing that the State did not establish a chain of custody for the victim's body to Dr. Li and thus could not verify that the autopsy was really that of the victim. Defense counsel also argued that the State had not established that Defendant was "sufficiently free of passion and excitement so as to be capable of proving premeditation" at the time of the killing. The trial court denied the motion for judgment of acquittal, stating that a sufficient identification of the victim's body had been established and that the issue of premeditation was one for the jury.

## C. Defense Proof

Stephen Chambers testified that he worked as a mechanic lead for DA Defense Logistics Headquarters, that he was a retired army staff sergeant, and that he was Defendant's father. Mr. Chambers said that, at the time of the shooting, Defendant was in school studying to be a laboratory technician. He stated that Defendant suffered from anxiety and that he had surgery in 2007 to correct an issue where his lungs would spontaneously collapse. Due to his lung condition, he had "very reduced cardio capabilities" and "running [was] very difficult. His lung could actually rip from the chest cavity and collapse again. His other lung could collapse." Mr. Chambers testified that, when Defendant was nervous, he would "get[] chatty" and "run his mouth about anything."

Mr. Chambers said that he trained Defendant to shoot a gun when Mr. Chambers was in the military working as a drill instructor and small arms training instructor. He taught Defendant "safety procedures for how to handle a weapon, always handling it as if it [were] loaded, safe range practices, how to handle a weapon in a self-defense situation." Defendant also practiced shooting targets every month or two and was "fairly accurate" up to sixty feet. Mr. Chambers taught Defendant never to carry a gun with a

cartridge in the chamber. Defendant would sometimes "pawn" his guns to Mr. Chambers for a loan.

Mr. Chambers testified that Defendant lived with Mr. Jacob Gibeau in the home belonging to the victim and Mrs. Gibeau. He said he spoke with Defendant regularly and interacted with the victim after the victim had heart surgery. Mr. Chambers stated that the victim did not appear disabled or incapacitated and that the victim "helped [Mr. Chambers] push a pickup truck onto a wheel dolly to move it[.]"

On cross-examination, Mr. Chambers agreed that he taught Defendant to keep the safety on his gun and stated that, with the gun Defendant was using, "the only way [a person] can engage the safety is if a round is in the chamber and [Defendant] was taught not to have a round in the chamber so the safety was immaterial." He testified that he taught Defendant not to put a round in the chamber until his life was threatened. Mr. Chambers agreed that he taught Defendant not to point a gun at someone unless he intended to shoot the person "because you feel your life is in danger."

Defendant testified that he was twenty-nine years old at the time of trial and that he had a lung condition and COPD. He said that, when he was a teenager, his lungs would spontaneously collapse, so he had surgery to fuse his right lung to his rib cage to keep it from collapsing. Defendant stated that he was unable to run long distances or do intense exercise. He said that, when the weather was cold or wet, he had "coughing fits."

Defendant said that he had known Mr. Jacob Gibeau for about ten years and that they were romantically involved for eight or nine years. Defendant stated that Mr. Jacob Gibeau's parents did not know of their relationship but that Mrs. Gibeau learned about it after the shooting. He said that, when the victim and Mrs. Gibeau lived in Massachusetts, Defendant and Mr. Jacob Gibeau would share a room but that they moved into separate rooms to "keep up appearances" when the victim and Mrs. Gibeau were back in Tennessee. Defendant testified that he did not like hiding the relationship but that he did it "out of respect for [Mr. Jacob Gibeau.]"

Defendant said that he met the victim at Christmas in 2007 and that he had never known anyone as large as the victim. He said that, for the first couple of years that he knew the victim, the victim was "friendly" but changed over the next several years. Defendant said the victim "kept getting angrier and angrier about how the world was changing from what he was used to." The victim told Defendant that "the reason we have an Ebola outbreak, that it was because of the acceptance of homosexuality[.]" Defendant did not believe that the victim knew about Defendant's sexual orientation or his relationship with the victim's son. The victim was never physically aggressive towards Defendant prior to October 5, 2016, and Defendant described the victim as "very

- 18 -

fatherly[.]" Defendant and the victim did have verbal disputes but "settled [the disputes] pretty quickly[.]"

Over the years, Defendant witnessed several occasions where the victim was aggressive with people. He witnessed an event where the victim "slapped and . . . began to choke" Mr. Jacob Gibeau, and Defendant and Mrs. Gibeau separated them. Defendant never saw the victim display violence towards Mrs. Gibeau. Defendant testified that, prior to the night of the shooting, he was "afraid of what [the victim] could do if he wanted to[.]" Defendant had extensive conversations with the victim about the victim's status as a Navy veteran and his prior employment as a prison guard. The victim told Defendant that he worked on the "Riot Squad" in the prison, and they discussed the victim's "baton training." Defendant stated, "[The victim] demonstrated some baton techniques. . . . [He] was showing me the way that they would shave it down at the prison. He showed me some of the choke holds they would do at the prison[.]" Defendant "did not like the choke hold demonstrations[,]" and he "did let [the victim] know about that" because Defendant did not "have good lungs," and it made it "hard to breathe." Defendant said that the victim's hand "could engulf [his] entire face and most of the top of [his] head."

On October 5, 2016, the victim and Mrs. Gibeau had been back from Massachusetts for about three weeks. Defendant testified that, prior to October 5, 2016, Mr. Jacob Gibeau had hidden from his parents the fact that the Explorer belonged to Defendant. On the night of the shooting, Mrs. Gibeau mentioned to Defendant that she had driven the Explorer. Defendant raised his voice and asked Mrs. Gibeau not to take the Explorer without permission because he had been "late to work or almost late to school" in the past. He told Mrs. Gibeau that the Explorer belonged to him. Defendant "did not feel it was much of an argument" but felt that he "was venting frustration[.]" Defendant and Mr. Jacob Gibeau then went upstairs, and Mr. Jacob Gibeau was upset that Defendant told Mrs. Gibeau that the Explorer belonged to Defendant. Mr. Jacob Gibeau and Defendant agreed that he needed to move out. Defendant said, "I was slightly ashamed because I felt that in my venting to [Mrs. Gibeau] I maybe was -- embarrassing myself a little. I always tried to keep a more level head and a calmer head with them because . . . I didn't want them to think badly of me[.]"

Defendant packed boxes and duffle bags and walked downstairs, went through the kitchen to the garage and then to the Explorer. Mrs. Gibeau was outside at that time, so Defendant apologized to her for his "outburst." Defendant testified that he put his belongings in the Explorer and removed some of Mr. Jacob Gibeau's belongings from the vehicle, and then the victim "starting asking [Defendant] questions in an angry tone." Defendant tried to answer his questions and walked back into the house through the garage door to retrieve more of his items. As he approached the stairs, Defendant heard

Mr. Jacob Gibeau call out to him, so he went into the living room where Mr. Jacob Gibeau was standing with the victim. Defendant said that he stood on the opposite side of the living room from the victim. He testified, the victim began asking a bunch of questions, but before I could finish an answer, the victim would interrupt and ask another question. Defendant described the victim's tone as "angry, very angry." The victim was upset with Defendant for not answering his questions. The victim told Defendant he owed him eight thousand dollars, and Defendant replied, "[F]*ck you." Defendant testified that, when he cursed at the victim, the victim quickly crossed the room, put his hand around Defendant's throat, "choking [him] and backing [him] into a wall" and "yelling in [his] face." Defendant did not recall the victim "backhanding" him. Defendant testified that he "was paralyzed and [he] couldn't breathe." Defendant said, "I thought I was going to die" and said the choking felt like it went on for "hours and hours." Mr. Jacob Gibeau and Mrs. Gibeau "got on" the victim and pulled him off of Defendant. He told the victim not to choke him, to which the victim replied, "[W]hat are you going to do to stop me? I'll f*cking kill you," and began choking Defendant again. Mr. Jacob Gibeau and Mrs. Gibeau immediately pulled the victim off of Defendant again.

Defendant testified, "I was scared. I was hurt. I felt betrayed. I didn't feel safe. I needed to go. I needed to get out of there." Defendant ran upstairs to "hide," and Mr. Jacob Gibeau followed him. Defendant said that he asked Mr. Jacob Gibeau to leave with him, and Mr. Jacob Gibeau said he would think about it. Defendant stated that he went to his room and grabbed whatever he had of value — his laptop, his phone, and his gun — and headed to his truck. Defendant testified that he owned the gun because he enjoyed going to the shooting range with his father and for home protection.

Defendant said that he was upset and sad after the living room altercation, and he walked through the kitchen to the garage to go to his vehicle. Defendant stated that he thought that the victim had left the premises but then heard the victim's voice coming from his left. He testified that he felt "terror, panic, fear" because "we were out here alone as far as I c[ould] tell; he had just tried to kill me and just threatened to kill me. No one [was] there to pull him off me this time." Defendant did not know what the victim said but described the victim's tone as "very angry" and "very loud." He stated that the victim was standing on the concrete walkway between the patio and the driveway. Defendant testified that he turned and said, "[D]on't say another godd*mn thing to me, I am leaving." He said that the victim then started "advancing towards me, he was walking towards me. . . . I perceived it to be him coming at me to finish what he started in the living room." Defendant stated that he pulled out his gun and pointed it at the victim and that there was not a round in the chamber at that point. Defendant said that the victim continued advancing towards him. Defendant testified, "I felt like he was going to kill me. I was terrified that he was going to kill me. I thought that there was nothing I could do to stop him from coming at me and finishing what he started and I was absolutely

terrified." Defendant stated that he chambered a round, and the victim did not stop. He said, "There was another movement in my direction. . . . He wasn't stopping when the gun was pulled. He didn't stop when the gun was cocked. I didn't have a choice." Defendant testified that he fired four rounds but only hit the victim one time at a short range, even though he practices at the range frequently. Defendant heard Mrs. Gibeau from inside the house say, "[O]h my god, he shot Dad," and then Defendant called 911.

Defendant testified that Detective Ewing interviewed him at the police station. He said that Detective Ewing kept asking him if he shot the victim because he was angry. Defendant stated, "There was some anger, not a lot of anger I would say. . . . At that time, I was also really terrified." He said that, during the police interview, he felt "immense remorse, immense — fear, remorse, sorrow, it's really hard to describe I think."

On cross-examination, Defendant stated that, prior to October 5, 2016, he was "afraid of what [the victim] could do" but "not afraid of what he would do" to Defendant. He agreed that, when Mrs. Gibeau borrowed the Explorer, he "cursed her." Defendant said that, when he cursed at the victim, his tone may have been "slightly angry," but he did not really remember. He agreed that he considered the victim to be a bigot. Defendant stated that, when he came out the garage door just prior to the shooting, he "walked straight out and before [he] could turn to the Explorer, [he] heard [the victim's] voice" and turned towards him. He agreed that, when he spoke to the 911 operator, he stated that he shot the victim "three or four times" in the "chest and neck." Defendant denied that he aimed the gun at the victim's chest but said, "[L]ogically, I thought it hit in the chest."

Defendant said that he thought the word "culpability" meant "responsibility." He agreed that, on the video recording from Officer Gray's patrol car, Defendant said to the officers, "I admit full culpability and I deeply regret my actions. I was angry, but that doesn't excuse what happened." Defendant agreed that he told Detective Ewing that the victim may have just "shifted" or "righted" himself, and he may have misinterpreted it. Defendant said, "I also said I believed then and I believe now he was coming towards me. I just — I could have misinterpreted it[.]" Defendant agreed that Officer Koski testified that it was about seventeen feet from the farthest sidewalk crack to the opening of the gate but said, "I think it doesn't feel like that distance[.] It feels a lot smaller. . . . I have never measured it so I can't say whether or not he's accurate on that measurement[.]" Defendant agreed that there was no physical contact between him and the victim outside before the shooting.

On redirect examination, Defendant explained that, after he pulled the gun, the victim did not stop but continued movements towards him and "leaned himself down to

- 21 -

what I would call a lunge or tackle position." He agreed that, in hindsight, the victim may have been doing "all sorts of different things." Defendant testified that he didn't believe he had any other choice but to shoot the victim because he could not run and because his vehicle was blocked in.

## D. Self-Defense Jury Instruction

Prior to closing arguments, a discussion was had on the record but out of the hearing of the jury concerning the proposed jury instruction. The State and Defendant acknowledged that they "had an opportunity to look at the proposed jury instruction[.]" The State said that it had no objections. Defendant asked the trial court to take out the word "unlawfully" in the definition of "violence" because Defendant was claiming self-defense. Defendant argued: "I don't know if he would be unlawfully pointing the gun if he was acting in self-defense?" The trial court stated that it would charge the pattern self-defense instruction. Neither side objected to the "unlawful activity" language of the proposed instructions.

The trial court instructed the jury on the charges and also that, if they found Defendant guilty of first or second degree murder, they were not to move on to the charge in count two: "unlawfully and knowingly employing a firearm during the commission of or attempt to commit a dangerous felony." The trial court then provided the jury with a self-defense instruction, which stated in part:

> Included in the defendant's plea of not guilty is his plea of self-defense.

> If a defendant *was not engaged in unlawful activity* and was in a place where he or she had a right to be, he or she would have a right to use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use of unlawful force. The defendant would also have no duty to retreat before using force.

> If a defendant *was not engaged in unlawful activity* and was in a place where he or she had a right to be, he or she would also have a right to use force intended or likely to cause death if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds. The defendant would also have no duty to retreat before using force likely to cause death.

(emphasis added). Following deliberations, the jury found Defendant guilty of the lesser-included offense of second degree murder. Pursuant to the trial court's instructions, the jury did not reach a verdict on count two.

*Sentencing and Motion for New Trial*

The trial court sentenced Defendant to eighteen years to serve at one hundred percent. Defendant filed a timely motion for a new trial and judgment of acquittal, which he later amended. Defendant argued that the evidence was insufficient to support a verdict of guilty, that the trial court erred by allowing the State to amend the indictment the morning of trial, that the trial court erred by admitting photographs of the victim's deceased body, that the incorrect self-defense jury instruction violated Defendant's constitutional rights, and that the verdict form violated Defendant's constitutional rights by omitting an option for a jury decision on self-defense.

The trial court denied Defendant's motion for a new trial and motion for judgment of acquittal, and Defendant timely appealed.

## Analysis

Defendant argues that the trial court erred by giving an improper jury instruction on self-defense, by granting the State's motion to amend the indictment on the day of trial, by permitting the admission of prejudicial evidence of photographs of the victim's body, by denying Defendant's Motion for Judgment of Acquittal and Motion for a New Trial, and by submitting an insufficient verdict form to the jury because it omitted an option for the jury to find on the matter of self-defense.

The State responds that the erroneous self-defense instruction is harmless beyond a reasonable doubt, that any error in the amendment of the indictment in count two was a nullity, that Defendant waived the claim of error in the admission of the photographs and that the admission was not plain error, that the evidence was sufficient to support the convictions, and that Defendant was not entitled to have the verdict form specify the reason for a finding of "not guilty."

*I. Self-Defense Jury Instruction*

Tennessee Code Annotated section 39-11-611 provides:

(b)(1) Notwithstanding [Tennessee Code Annotated section] 39-17-1322,[4] a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding [Tennessee Code Annotated section] 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (2018). A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). Thus, the mere fact that a defendant believes that his conduct is justified would not suffice to

---

[4] Tennessee Code Annotated section 39-17-1322 states:

(a) A person shall not be charged with or convicted of a violation under this part [Title 39-Criminal Offenses, Chapter 17-Offenses Against Public Health, Safety and Welfare, Part 13-Weapons] if the person possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which that person or the other person defended was a victim.

(b) A person who discharges a firearm within the geographical limits of a municipality shall not be deemed to have violated any ordinance in effect or be subject to any citation or fine the municipality may impose for discharging a firearm within the limits of the municipality if it is determined that when the firearm was discharged the person was acting in justifiable self-defense, defense of property, defense of another, or to prevent a criminal offense from occurring.

Tenn. Code Ann. § 39-17-1322 (2018).

justify his conduct. *Id.* A defendant is entitled to an instruction on self-defense if it is fairly raised by the evidence. *Myers v. State*, 206 S.W.2d 30, 32 (Tenn. 1947).

It is well-established "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). Moreover, "[t]he [S]tate has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996), *rejected on other grounds by State v. Williams*, 977 S.W.2d 101 (Tenn. 1998); Tenn. Code Ann. § 39-11-201(a)(3)(2018). As such, "in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

## A. Incorrect Instruction

"[T]he trial court has a duty to provide a 'complete charge of the law applicable to the facts of the case.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). However, jury instructions must be reviewed in their entirety, and phrases may not be examined in isolation. *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Majors*, 318 S.W.3d 850, 864-65 (Tenn. 2008) (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)) (internal quotation marks omitted). As noted by our supreme court:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Rimmer*, 250 S.W.3d at 31 (quoting *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997)). To determine whether a defendant is harmed by an erroneous instruction, "we must consider 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 31 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). To make that determination, the "significant question" is "'whether there is a reasonable likelihood that the jury has applied the challenged

instruction in a way' that violates the Constitution." *Id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

In *Perrier*, our supreme court recently discussed the application of the "unlawful activity" phrase in the self-defense statute:

> As [our supreme court] explained in *State v. Hawkins*, self-defense is a general defense and as such it
>
>> need not be submitted to the jury unless it is "fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c) [2018]. The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence. To determine whether a general defense has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. Whenever admissible evidence fairly raises a general defense, the trial court is required to submit the general defense to the jury. From that point, the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply.
>
> *Hawkins*, 406 S.W.3d [121] at 129 [(Tenn. 2013)] (citation omitted). Within this structure, the trial court makes the threshold determination whether to charge the jury with self-defense, and . . . the trial court, as part of that threshold determination, should decide whether to charge the jury that a defendant did not have a duty to retreat. As part of that decision, the trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the "no duty to retreat" instruction would not apply. Because the allegedly unlawful activity will oftentimes be uncharged conduct similar to evidence of prior bad acts, the procedure outlined in Tennessee Rule of Evidence 404(b) should be utilized by the parties.

*Perrier*, 536 S.W.3d at 403.

After our supreme court issued *Perrier*, the Tennessee Pattern Jury Instruction for self-defense was changed to comply with *Perrier*. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b). Thus, at the time of Defendant's trial, the question of whether a defendant is engaged in "unlawful activity" should not have been submitted to the jury.

The amendment reflects the holding in *Perrier* that a defendant's "unlawful activity," as determined by the trial court, applies only to a defendant's "duty to retreat," not to whether he is entitled to use self-defense. *Perrier*, 536 S.W.3d at 399. The trial court is required to hold a jury-out hearing to determine whether the defendant was engaged in unlawful activity. *Id.* at 403. If the court determines that the defendant was engaged in unlawful activity, the court must omit the portion of the jury instruction that states: "[t]he defendant would also have no duty to retreat before [threatening][using] force." *Id.* Moreover, even if the trial court determines that a defendant *was* engaged in unlawful activity, the trial court still has the obligation to instruct the jury on self-defense if it is fairly raised by the evidence; engaging in "unlawful activity" does not preclude the self-defense instruction. *Id.* at 399 (holding that "the phrase 'engaged in unlawful activity' applies only to a person's duty to retreat"); *Myers*, 206 S.W.2d at 32.

Here, Defendant argues and the State concedes that the trial court erred by giving the incorrect self-defense instruction to the jury. We agree. Based on our supreme court's holding in *Perrier*, the trial court's instruction to the jury to decide whether Defendant was engaged in "unlawful activity" in the context of the self-defense claim was error.

However, while the State concedes that the jury instruction was given in error, the State argues that this error was harmless beyond a reasonable doubt. Thus, we will turn to a harmless error analysis.

### B. Harmless Error

The harmless error doctrine recognizes that the central purpose of a criminal trial is to decide factual questions of a defendant's guilt or innocence, and it promotes the public's respect for the criminal process by focusing on the underlying fairness of the trial rather than technicalities or "the virtually inevitable presence of immaterial error." *State v. Rodriguez*, 254 S.W.3d 361, 366 (Tenn. 2008). "In order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Perrier*, 536 S.W.3d at 404 (Tenn. 2017), n. 8 (quoting *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013)). "[T]he touchstone of this inquiry is whether a rational trier of fact could interpret the proof at trial in different ways." *Cecil*, 409 S.W.3d at 610 (citing *State v. White*, 362 S.W.3d 559, 579 (Tenn. 2012)). When evidence regarding an erroneous instruction "could be interpreted in different ways," this court cannot conclusively say that a properly instructed jury would not have decided differently. *Id.*

In our harmless error analysis, we must determine whether it appears beyond a reasonable doubt that the erroneous self-defense instruction did not contribute to the

guilty verdict of second degree murder. *Perrier*, 536 S.W.3d at 404. In addition to the charge of first degree murder in count one, Defendant was charged in count two with "unlawfully and knowingly employing a firearm during the commission of a dangerous felony." The jury was properly instructed that "[a]ny person who employs a firearm during the commission of or attempt to commit a dangerous offense is guilty of a crime" and that "[i]f you find [D]efendant guilty of [f]irst [d]egree [m]urder, or [s]econd [d]egree [m]urder, you cannot find [D]efendant guilty of the offense of employment of a firearm during the [c]ommission of a [d]angerous [o]ffense, to-wit: [v]oluntary [m]anslaughter." The jury did not reach a verdict in count two. We only know that the jury rejected self-defense in count one. The jury could have reasoned that the employment of a firearm was unlawful activity. We cannot determine that beyond a reasonable doubt that the erroneous instruction did not contribute to the guilty verdict.

Further, an erroneous self-defense instruction is not prejudicial if the evidence showed that the defendant's belief "that he was in imminent danger of death or serious bodily injury was not reasonable[.]" *Perrier*, 536 S.W.3d at 405.

Here, the State argues that the error in the jury instruction was harmless beyond a reasonable doubt because "there was no discussion [at trial] whatsoever regarding the firearm charge [in count two], nor was there any argument about the defendant being engaged in unlawful activity prior to the shooting or having a duty to retreat." The State also notes that there was no dispute that Defendant had a right to be on the property and that Defendant had legal ownership of his weapon. Moreover, the State contends that, based on the evidence, "the jury could infer that [Defendant] shot the victim out of anger, not fear."

The State has not met its burden. The State's burden when a self-defense instruction is erroneous is not to show that there was no discussion at trial regarding the erroneous portion of the instruction, nor is it to show that the evidence of Defendant's guilt was sufficient. Once an erroneous self-defense instruction has been found, as the State concedes, the State bears the burden on appeal of proving *beyond a reasonable doubt* that "any belief on the defendant's part that he was in imminent danger of death or serious bodily injury was not reasonable[.]" *Id.*

Based upon the facts of the case, we cannot conclude that the error is harmless beyond a reasonable doubt. The evidence shows that the victim assaulted Defendant and threatened him with death just minutes before the shooting. One of the first statements that Defendant made to the 911 operator in the wake of the shooting referenced the victim's earlier attack on Defendant: "I was staying with [the victim] and he choked me. And then, he came at me again and I shot him." The victim was at least one foot taller than Defendant and weighed approximately seventy pounds more. Defendant knew that

the victim was a trained prison guard and a Navy veteran. The victim had practiced choke holds either on the Defendant or in his presence, and Defendant had witnessed the victim's physical violence against Mr. Jacob Gibeau in the past. Just before the shooting, the victim was being verbally aggressive towards Defendant and was again moving in Defendant's direction despite Defendant's display of a weapon. Defendant was unable to run because of his medical condition and unable to drive because he was blocked in. Defendant repeatedly stated that he thought the victim was going to kill him. Under these facts, the State has not established beyond a reasonable doubt that Defendant's belief "that he was in imminent danger of death or serious bodily injury was not reasonable[.]" Defendant is entitled to a new trial.

Even though we are remanding for new trial based on the erroneous jury instruction, we will address the other issues raised in the event of further appellate review or for the purposes of a new trial.

*II. Motion to Amend Indictment*

Defendant argues that the trial court erred by granting the State's motion to amend the indictment as to count two on the morning of trial. He contends that the amendment "denied [Defendant] a fair trial upon notice of the charges he was facing and without doubt fundamentally changed the allegation in [c]ount [two]." He also asserts that the amendment "cast confusion upon the jury instructions" and placed Defendant in the position of "not knowing until the day of trial exactly what charges would be pursued."

The State responds that, because the jury never deliberated on count two, any error was harmless. The State also argues that, because Defendant was prepared to defend against first degree murder in count one, he was equally prepared to defend against voluntary manslaughter. We agree with the State.

An indictment must inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." Tenn. Code Ann. § 40-13-202 (2018). An indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). "[T]he grant or denial of a motion to amend [an indictment] is a matter within the discretion of the trial court[,]" and "[t]his court will alter the trial court's decision only upon an abuse of discretion." *State v. Narrell Christopher Pierce*, No. M2014-00120-CCA-R3-CD, 2015

WL 2102003, at *15 (Tenn. Crim. App. May 5, 2015) (citing *State v. Kennedy*, 10 S.W.3d 280, 283 (Tenn. Crim. App. 1999)).

Tennessee Rule of Criminal Procedure 7(b)(2) states that "[w]ithout the defendant's consent and before jeopardy attaches, the court may permit such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced." Tenn. R. Crim. P. 7(b)(2).

Defendant was not convicted of any charge in count two. Thus, this argument is moot. *See State v. William E. Hale*, No. 03C01-9104-CR-115, 1991 WL 251500, at *2 (Tenn. Crim. App. Nov. 27, 1991), perm. app. denied (Tenn. Mar. 16, 1992). He is not entitled to relief on this basis.

## III. Prejudicial Evidence

Defendant argues that the trial court erred when it admitted photographs of the victim's body because the photographs were overly prejudicial. He contends that the photographs were irrelevant to every issue the jury had before it because the manner of death and the cause of death were undisputed; thus, the admission of the photographs was more prejudicial than probative. Defendant asserts that, because other photographs, testimony, and a "tape measure" demonstration were presented to the jury to help determine the distance between the victim and Defendant, the photographs of the victim's body were both irrelevant and cumulative.

The State contends that Defendant did not make a contemporaneous objection to the admission of the photographs and that the admission does not reach plain error. Specifically, the State argues that Defendant cannot show that it was not a tactical decision to not object to the admission of the photographs.

We agree with the State that Defendant has waived consideration of this issue by failing to object to the admission of the photographs at trial. The failure to make a contemporaneous objection constitutes waiver of an issue on appeal. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008); *see also* Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error[]").

## IV. Sufficiency of the Evidence

Defendant argues that the trial court erred in its denial of his motion for a judgment of acquittal because the evidence was insufficient to sustain the verdict.

Alternatively, Defendant argues that the trial court erred in its denial of his motion for a new trial because the verdict was against the weight of the evidence. He contends that "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, and the trial court should have acted as a thirteenth juror and granted a new trial."

The State responds that the trial court explicitly stated that it acted as the thirteenth juror and that, taken in the light most favorable to the State, there is sufficient evidence to support Defendant's conviction.

Under Tennessee Rule of Criminal Procedure 29, a trial court "shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Tenn. R. Crim. P. 29(b). Whether to grant a motion for judgment of acquittal is a question of law, and the trial court must look at the State's evidence in the light most favorable to the State and must "allow all reasonable inferences from it in the State's favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the evidence of the State," the trial court must deny the defendant's motion for judgment of acquittal. *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). In ruling on a motion for judgment of acquittal, the trial court looks at the legal sufficiency of the evidence and does not weigh the evidence. *Id.* "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction[,]" *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013), whether, when the evidence is viewed in the light most favorable to the State, any rational juror could have found the defendant guilty of the offense beyond a reasonable doubt, *State v. Collier*, 411 S.W.3d 886, 893-94 (Tenn. 2013).

Rule 33(d) of the Tennessee Rules of Criminal Procedure states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This rule is the modern equivalent of the "thirteenth juror rule" and requires the trial court to weigh the evidence and grant a new trial "if the evidence preponderates against the weight of the verdict." *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). Our supreme court has stated that this rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case[ ] and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). When a trial judge overrules a motion for new trial, absent any evidence that the trial court expressed dissatisfaction or disagreement with the weight of the evidence or the verdict, this court presumes that the trial judge has served as the

thirteenth juror and approved the jury's verdict. *Id.* Once the trial court fulfills its duty as the thirteenth juror and imposes a judgment, appellate review is limited to determining the sufficiency of the evidence. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).

Here, in denying Defendant's motion for a judgment of acquittal and motion for a new trial, the trial court explicitly stated that it was acting as the "13th Juror." "Because Defendant's argument regarding the motion for judgment of acquittal is essentially a sufficiency of the evidence claim and because the trial court fulfilled its role as thirteenth juror, we will address Defendant's arguments relating to his motion for judgment of acquittal and the trial court's role as thirteenth juror as raising one issue – the sufficiency of the evidence." *State v. Matthew Edwards*, No. E2017-02329-CCA-R3-CD, 2018 WL 5972775, at \*4 (Tenn. Crim. App. Nov. 14, 2018), *perm. app. denied* (Tenn. Mar. 27, 2019).

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged in this case, a person commits second degree murder when he knowingly kills another. Tenn. Code Ann. § 39-13-210(a)(1) (2016). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2016).

Here, Defendant testified that he was an experienced marksman and understood firearms. Moreover, when the officers arrived on the scene, Defendant was recorded saying, "I admit full culpability and I deeply regret my actions. I was angry, but that doesn't excuse what happened." Further, the jury could have accredited Mrs. Gibeau's testimony that the victim never choked Defendant but just "bumped chests." Taken in the light most favorable to the State, a rational juror could have found that Defendant acted knowingly when he shot four times in the direction of the victim and that Defendant acted out of anger rather than self-defense. Defendant is not entitled to relief on this basis.

*V. Verdict Form*

Defendant argues that the verdict form was "unsalvageable" because the jury instructions were fatally flawed. Moreover, he contends that "[t]he verdict form in this case altogether omitted any place for the jury to decide and note that they had concluded that [Defendant] did or did not act in self-defense" and that the question of self-defense should have been "the very first question posed on the verdict form." Defendant asserts that the jury's question to the trial court during deliberations regarding the verdict form proves that the jury was confused because, "[i]f the jury concluded that [Defendant] acted in self-defense, . . . all of the following options on the form were moot."

The State responds that Defendant presents no authority for his assertion regarding the order of choices on the verdict form and that Defendant was not entitled to have the self-defense choice precede all others. We agree with the State.

In *State v. Inlow*, this court rejected the defendant's argument that the verdict form was deficient for failing to include a space for the jury to mark "not guilty by reason of self-defense." 52 S.W.3d 101, 109 (Tenn. Crim. App. 2000), petition to rehear. Moreover, "[t]he presumption is that a jury follows the instructions of the court." *State v. Vanzant*, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983). "In order to overcome this presumption, an accused must show by clear and convincing evidence that such instruction was not followed." *Id*.

Defendant has not shown that the jury failed to follow the instructions given by the trial court as to how to complete the verdict form, and he cites no authority to support his argument that a choice of "not guilty by reason of self-defense" should precede all others on the verdict form. Defendant is not entitled to relief on this basis.

## Conclusion

The judgment of the trial court is reversed. Because the jury found Defendant not guilty of first-degree murder in count one, the case is remanded for a new trial on the offense of second-degree murder in count one, and because a mistrial was declared for count two, for a new trial if the State elects to proceed on the offense of employment of a firearm during the commission of a dangerous felony in count two.

_____
ROBERT L. HOLLOWAY, JR., JUDGE